and it's 5-17-0148 out of Madison County. Mr. Drips. Thank you, your honor. May it please the court, I'm Rory Drips and I represent the plaintiff Stephen Campbell. The crux of defendant's brief in this case acknowledges that there was no evidence of any other cause of plaintiff's injury besides the dog attack in this case. Instead, the defendant argues that the Voight-Gin line of cases is inapplicable to cross-examination. That's wrong for the reasons stated in the briefing and for which I'll get to later. But first, it's important to recognize that the record shows defendant's position in its briefing here is not the position it took in front of the jury. And in closing, Mr. Murphy, and this is in the record at the trial transcript, it's page 212-213, Mr. Murphy urged the jurors to speculate about other causes of the plaintiff's injury. He did it very artfully by telling the jury that instruction number one allowed them to determine what the injuries are and that there were probably other incidents that caused plaintiff's ongoing problems. And what Mr. Murphy told the jury was this, and this is from page 212 lines three through nine. We've all had, I mean at least people I know, have had situations where you're lifting something that you shouldn't. You're lifting one of those old tube TVs to get rid of it and your back goes out. That's what happens when you lift too much. He lifts large packages for work, and those are the kinds of things that are going to hurt his back. Now, he continued this line on the next page, 213 at lines 15 through 19. Now, did he twist his back and injure his back? He probably did so, but you have to think of the severity of that versus falling out of, you know, a ladder, things like that, which is a much more significant impact. There was no evidence, much less medical testimony, to support any of these claims. Those closing argument points were based on the cross-examination of Dr. Kennedy that is at issue in this appeal. That cross-examination elicited hypothetical causes of Mr. Campbell's injuries, even though no doctor testified that any of these hypothetical causes were actual causes of his injuries, let alone the sole cause as required by Voykin. Even worse, there was no evidence that any of these things ever happened. Why was the testimony prejudicial? The cross-examination questions of Dr. Kennedy were prejudicial because those were the only evidence in the case that pertained to potential intervening causes. Defendant could have asked Dr. DeGrange, who was the other testifying doctor, if his review of the records revealed some intervening incident, but defendant did not even ask Dr. DeGrange about intervening causes. The record provides no support for questions of any physician concerning intervening causes of plaintiff's injury. Those do not exist. And the Supreme Court's decision in Voykin and this Court's decisions in the Hawks and in Brown v. Baker cases all require the defendant to induce expert testimony before evidence of another injury can be presented to the jury. At the heart of those decisions, excluding this type of evidence, is the recognition that such evidence not only invites but requires the jury to speculate. Now, earlier today, I filed a motion for leave to cite additional authority, and I'm not going to discuss the case here. I'm just going to mention this Court recently decided Peach v. McGovern dealing with jury speculation. I know that Mr. Murphy hasn't had a chance to see that, so I'm not going to point that out, other than to say I filed a motion for leave to cite. But the cases provide no special exemption for cross-examination, and specifically the Obzanski and Lagasty cases cited in the brief pertain to cross-examination, and Obzanski says it's reversible error to permit cross on subsequent injuries that aren't connected up. So why was the testimony prejudicial in this case? Here's why. The jury's verdict reflects an injury to the point of beyond the eight days that Dr. DeGrange testified to. I think the first question the Court would have would be, doesn't Dr. DeGrange's testimony sustain the verdict? The answer is no, and it's because Dr. DeGrange said he was cured after eight days. So the verdict rests on the idea that there was some intervening injury for which the record supplies no evidence. Another way of saying that is that the record supplies no evidentiary support for a proposition, which means the jury engaged in ranked speculation. And when a judgment rests on speculation, it must be reversed. Defendant concedes, both in its brief and in the trial court, that there was no evidence that plaintiff had either a prior injury or a post-incident injury. Given that, what the defendant asks this Court to do is to give defendants license to plant in the jurors' minds suggestions that are based on nothing but speculation and conjecture. If the Supreme Court's decision in Vulcan is to mean anything, it must mean that lay jurors cannot base their verdicts on spurious causes that have neither been endorsed by a medical expert nor have been identified by any witness as having actually occurred. And I want to put this issue into context for us. First, this was not a defense verdict, so there can be no claim that, in this case, the jurors found for the defendant unliability, and that's why the trial court's error would be harmless. That's not available in this case because damages were the only issue in this case. The trial judge directed a verdict on harboring the dog. That's not an appealable issue in this case. It wasn't appealed. And the jury did award damages. How do I know that the verdict was not based on Dr. DeGrange's testimony? I mentioned Dr. DeGrange said he was cured after eight days, but the jury cut the plaintiff's damages off over two weeks after his injury. How do I know that? Well, I know it based on the wage loss number. The jury awarded $4,000. That's almost twice what Dr. DeGrange's testimony would support. In the plaintiff's testimony, and this is in the record of C00099, the plaintiff earned $95,000, or $1,826 per week, or $261 a day. He earned less than that in 2014, the year of the injury. If the jury believed Dr. DeGrange's testimony that after eight days he was cured, they would have awarded no more than $2,088, but they awarded almost twice that much. There's no evidence to support the finding of lost benefits caused by eight days off of work, so the damage number cannot be sustained by reference to lost benefits. So now I want to get to the actual cross-examination questions. In the trial court, permitted defendant to ask Dr. Kennedy if, and the question was, sometimes people's backs will just go out for no reason. Would you agree with that? Answer, yes. Question, they call it an idiopathic cause. Answer, right. That's in the record at page 281. Now, there's no evidence of an idiopathic cause. There's no evidence that the plaintiff's back went out for no reason. Now, if somebody had said, you know, two weeks after he got hurt at work, he said he was doing well and then his back just went out for no reason, then we can ask that, but there's no evidence to support that question. No other doctor, including Dr. DeGrange, testified that plaintiff's condition was related to idiopathic causes. No other physician, including Dr. DeGrange, testified that plaintiff's back went out for no reason. There was no evidentiary support for the testimony, and it was prejudicial because it required the jury to speculate. The trial court also permitted defendant to ask Dr. Kennedy if, and here's the question, the angular fissure, we talked about that, that could be caused, you mentioned it could be caused by an incident like he described to you with the dog, but it could be caused by many other factors. Would you agree? Answer, possible. Question, lifting, twisting, any kind of daily activities involving those type events. Well, I think as a general proposition that's possible, yes, and that's in the record at page 281. Now, that dovetails exactly with the argument that he made to the jurors in closing. No physician, including Dr. DeGrange,  There was no evidentiary support for the testimony, and it was prejudicial because it invited the jury to speculate. Even Mr. Murphy agreed at the trial. There was no evidence of any other cause. At the post-trial motion hearing, and this is in the record at page 261, Mr. Murphy says to the court, Specifically, at no point was there any evidence presented to the jury of any accident. There's no evidence that I've presented of previous accidents. There's no evidence I've presented of a subsequent accident. Why are we talking about other causes then? It just makes no sense. He said the same thing to this court in the brief. But as I mentioned before, what he argued to the jurors is there must have been something else. And so what Mr. Murphy needed was an explanation for the gap of a few weeks in treatment that the plaintiff had. He had an injury, he gets some treatment, there's a gap, and then he gets into the neurosurgeon, has an MRI, and ultimately has surgery. So what happened was that Mr. Murphy bridged that gap with the cross-examination questions at issue. And that's also why the verdict in this case is against the manifest weight of the evidence. Here's the point I'm trying to make. In this case, and this case is a little unusual, because there's really no wiggle room between the two doctors. One doctor says the condition went on for years, required surgery, had all kinds of workup and lengthy treatment. The other doctor says eight days. The jury picked a number that was not in the middle but between those two. There's no basis for that. And we know that the jury did that based on the weight loss number. That's a concrete number. That's not something that is within their discretion in this case because one doctor says eight days. Nobody said anywhere from, you know, three weeks to three years. There's no evidence of that from a medical doctor. So no doctor provided testimony that actually supported the number they gave. And jurors do not have the medical knowledge to make an independent assessment of how long plaintiff's injury lasted. But that was the argument that Mr. Murphy made to them based on the trial court's instructions. He said, you get to determine what the injury is. And that's what the jurors did. They picked a number that was not supported by the testimony of either doctor. And for that reason, the verdict is against the manifest weight of the evidence and plaintiff requests that the court reverse and remand for a new trial based on the prejudicial error in the cross-examination of Dr. Kennedy and because the verdict is against the manifest weight of the evidence. Thank you. Thank you. We'll have five minutes. Mr. Murphy. May it please the court, my name is Mike Murphy and I represent the appellate Kevin Autry. Now there are two issues in this appeal. The first issue is whether the limited questioning that I made with Dr. Kennedy violated Boykin. The second issue is whether or not the verdict was against the manifest weight of the evidence. With respect to the questions of Dr. Kennedy, there are essentially two questions that I asked Dr. Kennedy. And these were foundational questions which were discussing medical facts and not causation opinions. And the answer was, can PACS go out for no reason? The answer, yes. And the second question was, can an annular fissure be caused by lifting or twisting? Those two questions were limited. There was no further, there was no argument on opening statement. There was no questioning of the plaintiff. There was no questioning of the plaintiff's family. There was no questioning of Dr. Kennedy. There was no argument on closing statement, closing argument, that there was a specific incident post or subsequent, or previous or subsequent, that caused this gentleman's condition. Every case that's cited, beginning with Boykin, the Rojas case, all those cases, talk about parties, defendants attempting to get in specific incidents into evidence. In this case, we made no attempt to bring in any specific incident, either before the accident or after the accident, to cause any injury or the ill condition that he was complaining of to the plaintiff. The cases, and I can distinguish each of the cases, if the court would, would point one, Boykin, Noble, Obzanski, Hellermann, Lagesse, all have the same issues, and that is the defense attorney attempting to place the blame on a previous incident or a subsequent incident. That did not occur in this case. The argument, the second argument, and it goes into whether or not those two questions, There were two questions that were asked to Dr. Kennedy, which were foundation questions. Out of the entire trial, the evidence was, and contrary to what Mr. Drips said, the plaintiff in this matter never had surgery. And here's the scenario of the plaintiff's treatment, which we believe supports the issue that those two questions of Dr. Kennedy, if they were in error, is now a reversible error, and the second case is that the verdict is not against the manifest way of the evidence. This accident happened on July 18th of 2012. That same day, the plaintiff went to Midwest Occupational Medicine, saw the doctor, complained of 10 out of 10 pain, prepared a diagram showing where the pain was, what the level of the pain was. He went back the very next day, saw the same doctor, had the same report, filled out the examination, the diagram showing he had a pain of 3 out of 4. What's important about that second examination was Mr. Campbell's physical examination was normal at that time. He had normal range of motion, normal strength, normal sensation. He was having complaints of pain. He came back 8 days after the accident, July 26th of 2012, reported to the doctor that his complaints were completely resolved, that he was pain-free. He filled out that same pain diagram showing 0 out of 10 pain in his own handwriting. At that point, Dr. O'Shearing, the Midwest Occupational Medicine doctor, released him. And to get to Mr. Drip's point about the lost wages, what the evidence was that Mr. Campbell had a vacation planned the very next week after he saw the doctor. So that was two weeks afterwards. If you do the math, two weeks out of 95,000 is $4,000, which is precisely what I argued at closing argument, that they should give him, there was a range, but that wasn't the range. But that accounts for the two weeks of lost wages. The one week to the 28th, and the second week that he said he had planned on taking the vacation, he told this to the doctor, and the jury decided to award him that amount. After he was released, and I believe this is the main basis for the jury's verdict, Mr. Campbell was released on July 26th of 2012. He continued to work for almost a year after that point, up until May of 2013. During that time, he did go back to Midwest Occupational Medicine, saw a different doctor. His examination was normal at that point. He was not taken off work by that doctor. He was then seen by Dr. Kennedy, the plaintiff's doctor, in November of 2012, which is four months after the accident. Dr. Kennedy does not take him off of work at that time. He then sees Dr. Feinberg, beginning in January, I think, of 2013, and February of 2013. Dr. Feinberg doesn't take him off work, only orders physical therapy. He then returns to Dr. Kennedy in May of 2013, and for no explained reason, takes him off work at that time. And so this gentleman is off work from May of 2013 until July of 2014 when he goes to see Dr. DeGrange. He's sent to Dr. DeGrange by his employer. Dr. DeGrange examines him. The examination is completely normal. Normal range of motion, normal strength, normal sensation. Neurological exam is normal. Dr. DeGrange releases him and says you can return to work. Mr. Campbell, working for UPS, has to have an EIDA examination. He passes the EIDA examination, goes back to work. And then it wasn't mentioned by Mr. Dripps in his statement, there is a second incident. And everybody agrees that there's a second incident. Their doctor, Dr. DeGrange, sometime in late 2014, Mr. Campbell's at work. He's lifting 125 pounds, deer stand, injures his back, goes back to Dr. DeGrange. And what's significant about the second examination for Dr. DeGrange, he's the company doctor. And people are just going to think, well, he's going to rubber stamp this guy. He's going to send him back to work. When he goes back to see Dr. DeGrange in 2015, Dr. DeGrange takes him off work. Dr. DeGrange finds an abnormal examination, finds he has reduced range of motion. He has a deficit in his left foot strength. He has a spasm, all new findings. So Dr. DeGrange takes him off and he gets the treatment. If you look at the plaintiff's treatment after the dog bite, it consists of a couple of doctor visits and a handful of physical therapy visits. That's the only treatment he got before the deer stand incident. After the deer stand incident, he got more physical therapy and some injections. But the sum and substance of the treatment that he got was a couple of doctor visits and a handful of physical therapy visits. And Dr. DeGrange and Dr. Kennedy both testified that muscle strains such as the plaintiff sustained are recallable within a couple of months. Dr. DeGrange said four to six weeks. Dr. Kennedy said at most three months. And... Didn't Dr. Kennedy causally relate, though, the second accident as an exacerbation of the original injury? He did. He called it an aggravation. He said that he didn't believe that he was recovered by that time. And that was Dr. Kennedy's testimony on that issue, which was disputed by Dr. DeGrange. I mean, Dr. DeGrange testified that when he saw Mr. Campbell before the deer stand accident, his exam was completely normal. So Dr. DeGrange specifically testified that it was a new injury in his testimony. And Dr. DeGrange's testimony alone supports the basis for the verdict in this case. Dr. DeGrange testified that it was his opinion that Mr. Campbell's injury had resolved within eight days based upon the records and examination of the pain diagrams and things of that nature. The damage amounts, the $4,000 is the amount. I suggested a range between $2,000 to $6,000. They gave $4,000. The pain and suffering was the same. I think the pain and suffering, they gave exactly what I recommended. And that's based upon our theory of the case that this gentleman's condition had resolved within eight days. Thank you. Thank you. Do you have any other questions? What I would say in conclusion is every one of the cases cited by plaintiff are distinguishable from our case. In our case, there was no argument made that there was a specific prior incident or a specific subsequent incident that causes this gentleman's condition of well-being. Our theory in the case was consistent from the beginning to the end that this gentleman had recovered within eight days following the accident. So it's your position that Boykin and its progeny requires that there be a specific other injury. You can't just say anything could happen, and that's permissible. That's not speculation or conjecture just to say, well, a meteorite could have dropped on him. We don't know that. I think Boykin stands at very specific events. I think that just goes to general speculation. And there was no argument made. Well, how is what you've proposed different than general speculation since there was no doctor that said that this was the cause? We didn't argue that it was a cause, Your Honor. We never argued that idiopathic, that lifting a television. And the lifting of the television, and I don't have more to do with the muscle strain, the recovery time, and what Dr. DeGrange or what Dr. Kennedy said, recovery time of a couple of months. But I never argued that he was lifting a television, that it went on idiopathic, didn't argue at an opening, didn't question any witnesses, didn't argue in closing. I mean, those questions, those two questions of Dr. Kennedy were simply to establish medical facts. How are these things caused? Can you explain how they were caused? But isn't what's germane and relevant what caused this individual's injury, not what could cause somebody else's injury? Well, I think you are entitled to cross-examine the doctor about his opinion on the basis of it. And you think the case law supports you asking whether or not it could be some other unknown? That was the way it was phrased. I think it was more foundation. Dr., how are these things caused? It's like cancer. Cancer can be caused by asbestos, can be caused by all kinds of things. It's not like later I said it's caused by exposure to chemicals or smoking. I never made those arguments. So you're saying that that was a foundational question in cross-examination? Just to test. His opinion was it was related to the accident. And he went back and said it's related to the accident. And at no point thereafter did we ever argue anything different. We never argued it was a lifting incident. We never argued. The lifting has to do with the fact that this gentleman was able to return to work in July of 2012 and work full duty without restrictions until May of 2013. And there was testimony that during this time he's lifting 100-pound televisions. He's doing heavy lifting. And so that goes into our argument that he didn't need to be off work because he was doing all this work. He was able to do the work until Dr. Kennedy decided in May of 2013 to take him off work. What's interesting about Dr. Kennedy at that point, Dr. Kennedy takes him off work to get more treatment. This gentleman doesn't get any more treatment until he's sent back to work by Dr. DeGrange. From May of 2013 until July of 2014, he gets nothing done. And that's because of UPS. I mean, that was brought into the case. That doesn't have anything to do with Mr. Arthur. Meaning that they didn't provide the financial support for treatment. Correct. Thank you. Thank you very much. First, you're right. Mr. Murphy's right. He did not have surgery. And I apologize because I got for a moment confused with this case with the 10 o'clock case. The plaintiff did have surgery, but that's my fault and I apologize. Mr. Murphy just got through telling you that the question related to medical facts, not causation. And we just asked the court to look at the transcript at page 281 where he says, they call it an idiopathic cause. And on that same page, he says, it could be caused by an incident like he described to you with the dog, but it could be caused by many other factors, would you agree? Answer, it's possible. Question, lifting, twisting, any kind of daily activities involving those type events. Those are causation questions. Those are not foundational questions. And if he had followed it up by saying, doctor, were you aware that the plaintiff went to the emergency room eight days after this incident and he's complaining of lower back pain because of lifting, twisting at work, okay, fair game. But when there's nothing like that, they're just inviting the jury to speculate. And Mr. Murphy said he didn't argue that to the jury. At pages 212 and 213 of the trial transcript, his closing accident, he says, at least people I know have had situations where you're lifting something that you shouldn't. You're lifting one of those old tube TVs to get rid of it and your back goes out. That's what happens when you lift too much. He lifts large packages for work, and those are the kind of things that are going to hurt his back. Next page, 213, he argues, you have to think of the severity of that versus falling out of, you know, a ladder, things like that. There's no evidence of falling out of a ladder. And the reason I didn't address the second incident was because it was in 2014, and the jury's focus was on the events August, September, October of 2012. And while Mr. Murphy was correct about the extent of treatment, what he didn't tell you was that there was an MRI study done that Dr. Kennedy interpreted as showing a tear in the disc, and Dr. DeGrange never looked at the film. So that's... When was the MRI done? I believe it was... I guess the best answer is I don't know off the top of my head. When was it done or where? When approximately? I believe September or October, maybe November. But I think right after he saw Dr. Kennedy. And Dr. Kennedy said it shows this tear. And so the treatment, I think, is not particularly relevant in determining how severe the injury was when the MRI provides objective proof of what the injury actually was. And so while there was a subsequent injury later on that plaintiffs tried to link up two years later, there was nothing in that window of time that the jury focused on and cut plaintiff's damages on that would justify the numbers they came up with. And the idea that his vacation somehow did that, the numbers don't add up that Mr. Murphy is asking you to use to sustain the verdict. Even if you assume that the jury more collateral source, they're still cutting him off on eight days. So eight days after the injury is eight days after the injury. They went two weeks. So it doesn't make sense. So that's why I submit it's against the manifest way of the evidence, because if it doesn't make sense and there's not a specific factual predicate in either testimony about actual events or medical causation, the verdict's against the manifest weight and the case should be reversed. What would have been the weight loss up to the second deer stand situation? Just roughly. About $210,000, I believe, somewhere in that neighborhood. It's $95,000 a year at that point. So $190,000. Thank you. Thank you. The court will take this under consideration and issue a ruling in due course.